# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 10, 2023 Session

## BRANDON VANDENBURG v. STATE OF TENNESSEE

**Appeal from the Criminal Court of Davidson County**
**No. 2015-C-1517     Monte Watkins, Judge**

———————————

### No. M2022-01548-CCA-R3-PC

———————————

The Petitioner, Brandon Vandenburg, appeals from the Davidson County Criminal Court's denial of his petition for post-conviction relief from his convictions for four counts of aggravated rape, one count of attempted aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography of the victim. On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his claims alleging that he received ineffective assistance of counsel by (1) lead counsel's failure to have a witness qualified as an expert psychiatrist at trial, (2) lead counsel's failure to introduce prior bad act evidence regarding the Petitioner's codefendants at trial, and (3) lead counsel's failure to have the Petitioner's voicemail to Mr. Quinzio admitted as an exhibit at trial. The Petitioner also raises freestanding post-conviction claims, arguing that the trial court violated the Petitioner's protection against double jeopardy by (1) allowing him to be retried on amended charges after jeopardy had attached and (2) allowing the State to proceed with a superseding indictment without disposing of the original indictment. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JOHN W. CAMPBELL, SR., JJ., joined.

Manuel Benjamin Russ, Nashville, Tennessee, for the appellant, Brandon Vandenburg.

Jonathan Skrmetti, Attorney General and Reporter; Andree Sophia Blumstein, Solicitor General; Alicia Gilbert, Office of the Solicitor General, Honors Fellow; Glenn R. Funk, District Attorney General; and Roger D. Moore and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I.     FACTUAL AND PROCEDURAL HISTORY

### A.     Trial Proceedings

This case arises from the Petitioner's participation in a number of sexual offenses perpetrated upon the victim in June 2013.  In August 2013, a Davidson County grand jury indicted the Petitioner and his codefendants, Corey Batey, Jaborian McKenzie, and Brandon Banks, with five counts of aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography. *See State v. Vandenburg*, No. M2017-01882-CCA-R3-CD, 2019 WL 3720892, at *1 (Tenn. Crim. App. Aug. 8, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020). The Petitioner and codefendant Batey proceeded to trial in January 2015, and the jury convicted the Petitioner of four counts of aggravated rape, one count of attempted aggravated rape as a lesser included offense, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography.  *Id*.  Months later, on June 23, 2015, the trial court ordered a new trial after finding that the jury foreperson had failed to disclose during voir dire proceedings that he had been named a victim of statutory rape in a prior criminal case.  *Id*.

On July 7, 2015, a Davidson County grand jury returned a superseding indictment that charged the Petitioner and his codefendants with five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography.  *Id.*  As to the aggravated rape and aggravated sexual battery counts, the original indictment alleged that the Petitioner and his codefendants "were aided or abetted by one or more other persons" but did not specify whether "[f]orce or coercion [was] used to accomplish the act" or whether the Petitioner "kn[ew] or ha[d] reason to know that the victim [was] mentally defective, mentally incapacitated or physically helpless."  *See* Tenn. Code Ann. §§ 39-13-502(a)(3)(A), (B); -504(a)(3)(A), (B).  As to these counts, the superseding indictment specified that the Petitioner and the codefendants "did aid or abet each other in the commission of the offense[s]" and that they "knew or had reason to know that [the victim] was mentally incapacitated or physically helpless" during the commission of the offenses.  *See id.*; *see also Vandenburg*, 2019 WL 3720892, at *23.  Additionally, the superseding indictment did not include the charge of tampering with evidence.

Before the June 2016 trial, the Petitioner failed to timely file an expert witness disclosure regarding Dr. Sidney Alexander, whom the defense sought to testify regarding the Defendant's mental condition and intoxication on the night of the offenses.  *See*

*Vandenburg*, 2019 WL 3720892, at \*28-29. The State filed a motion to exclude Dr. Alexander's testimony, which the trial court granted on May 18, 2016, because lead trial counsel ("lead counsel") failed to meet the "deadline for the defense to give notice of an expert and provide a report of that expert's findings[.]" *Id.* at \*29. On May 31, 2016, lead counsel filed a motion requesting the trial court to reconsider this ruling and attached Dr. Alexander's report, which was dated May 27, 2016. *Id.* In his report,[1] Dr. Alexander indicated that his opinions were based upon information provided by defense counsel, along with his training and experience as a psychiatrist. Dr. Alexander opined that that the Petitioner's blood alcohol level would have been between 0.18 and 0.25% (mg/dl) fourteen hours after he began drinking. Dr. Alexander further opined that the Petitioner "would have been severely impaired in many facets of functioning" and that, even at the low end of his estimated blood alcohol level, the Petitioner "would have exhibited poor judgment, altered perception of his environment, greater susceptibility to the influence of others, poor impulse control, and overall diminished brain functioning." Despite its previous ruling that the defense's expert notice was untimely, the trial court held hearings at the outset of trial on June 10 and 13 to determine whether Dr. Alexander's testimony was admissible. *Id.* at \*29-30.

At the hearing, Dr. Alexander testified that as a psychiatrist, he had experience with individuals suffering from the effects of alcohol. *Id.* at \*30. He explained that he input the estimated number of alcoholic drinks the Petitioner had consumed the day of the incident into a formula and that the results indicated the Petitioner had an estimated blood alcohol level of 0.22. *Id.* Dr. Alexander testified that based on his experience and the results of the formula, the Petitioner would not have been able to form the requisite intent for the charged offenses. *Id.* Dr. Alexander testified that he was not a certified toxicologist and that after medical school, he had not received any specific training in toxicology. *Id.* at \*31. Dr. Alexander said that he did not normally prepare reports such as the one he had prepared for the Petitioner. *Id.* Dr. Alexander also testified that in forming his opinion, he relied on an email questionnaire containing the Petitioner's responses and did not interview the Petitioner. *Id.* Dr. Alexander testified that he did not have enough information to determine whether the Petitioner was malingering. *Id.* He also stated that he did not review video surveillance of the Petitioner's actions on the night of the offenses prior to composing his report. *Id.*

In a June 14, 2016 written order, the trial court stated its reasons for determining that Dr. Alexander's testimony was not admissible:

---

[1] We have taken judicial notice of the appellate record from the Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c).

- 3 -

[(1)] although each party has had ample time to conduct an evaluation of [the Petitioner] . . . , neither party has secured an evaluation of the [Petitioner]; (2) although Dr.[] Alexander testified regarding his psychiatric expertise, Dr. Alexander did not demonstrate any specialized expert opinion knowledge or training regarding toxicology; and (3) Dr. Alexander relied on information supplied via email by defense counsel and did not base any opinion on data, documentation or scientific evidence. Further, the [c]ourt finds that the underlying facts indicate a lack of trustworthiness of Dr. Alexander's testimony.

*Id.* at *29.

At the June 2016 trial, the evidence showed that surveillance footage recorded the Petitioner and his codefendants carrying the unconscious victim into a Vanderbilt University dormitory. *Id.* at *1. At 2:37 a.m., the Petitioner, accompanied by the codefendants, carried the victim into his second-floor dorm room, which is where the offenses occurred. *Id.* at *2. At 3:09 a.m., the Petitioner left his dorm room and placed a towel over one of the dorm's second-floor surveillance cameras to block the camera's view. *Id.*

Using his phone, the Petitioner took photographs and video recordings while the codefendants committed the offenses against the unconscious victim, and the video evidence showed the Petitioner and codefendants laughing and encouraging each other. *Id.* at *59. Regarding the first four counts of aggravated rape of the victim, the evidence showed that codefendant Banks penetrated the victim's anus with an object, codefendant Batey digitally penetrated the victim's vagina and anus, and codefendant Batey forced the victim to perform fellatio on him. *Id.* at *58.

Pertaining to the attempted aggravated rape count, the evidence showed that the Petitioner photographed and recorded codefendant Batey's attempting to penetrate the victim's vagina with his penis. *Id.* at *59. The Petitioner's video recordings depicted the Petitioner and codefendants laughing as codefendant Batey kneeled next to the unconscious victim with his pants and underwear pulled down. *Id.*

Regarding the Petitioner's convictions for two counts of aggravated sexual battery, the evidence showed that codefendant Banks touched the victim's genitals. *Id.* at *60. The evidence showed that codefendant Banks had taken a condom from the Petitioner and that Banks had deleted certain photographs from his phone. *Id.* Recovered photographs depicted codefendant Banks spreading open the victim's labia to photograph her vagina.

- 4 -

*Id.* Close-up photographs of the victim's genitals and anus were recovered from codefendant Banks' phone. *Id.* The evidence also showed that codefendant Batey placed his buttocks with exposed genitals on the victim's face. *Id.* Before this offense, codefendant Batey said that he "had never had his a[--] ate before." *Id.*

Regarding the Petitioner's conviction for unlawful photography, the evidence showed that the Petitioner used his phone to take photographs and videos of the offenses and that they had been deleted after the offenses occurred. *Id.* at *60. A detective recovered nine images and three videos of the victim on the night of the offenses, all of which depicted her lying unconscious on the floor of the Petitioner's dorm room and her clothing removed or moved to expose her body as the Petitioner and his codefendants committed the previously summarized offenses. *Id.* Moreover, the evidence also showed that during the offenses, the Petitioner watched pornographic videos and attempted to achieve an erection. *Id.*

The Petitioner sought to admit a voicemail he left on Joseph Quinzio's phone on the night of the offenses to show that he was too intoxicated to be criminally responsible for his codefendants' conduct. *Id.* at *45. The voicemail contained the following message: "First of all, he was pissing on her p[---]y. He was pissing on her. Hold on, hold on. [muffled noise/unintelligible] Dude, you gotta call me back bro. I'm in deep s[--]t. You gotta call me back. [muffled noise/unintelligible]." However, the trial court excluded the voicemail on hearsay grounds. *Id.*

At the conclusion of the trial, the jury convicted the Petitioner as charged. *Id.* at *17. The trial court sentenced him to an effective seventeen-year sentence and denied the Petitioner's motion for new trial. *Id.*

The Petitioner filed a timely appeal from his convictions and raised multiple issues, including the trial court's denial of his motion to dismiss the superseding indictment on due process and double jeopardy grounds, the trial court's exclusion of Dr. Alexander's testimony, the trial court's exclusion of the Petitioner's voicemail on Mr. Quinzio's cell phone, and the trial court's exclusion of evidence of the codefendants' prior bad acts. *Id.* at *1. This court vacated the Petitioner's conviction for one count of aggravated rape, modified the conviction to attempted aggravated rape, and remanded to the trial court for resentencing for this conviction. *Id.* This court otherwise affirmed the Petitioner's convictions. *Id.*

## B.     Post-Conviction Proceedings

Post-conviction counsel filed a timely petition for post-conviction relief and subsequently filed an amended petition for post-conviction relief, alleging that the Petitioner received the ineffective assistance of trial counsel and that the trial court had committed error related to the superseding indictment and its exclusion of evidence pertaining to the codefendants' prior bad acts.

At the August 19, 2022 post-conviction hearing, Dr. Alexander testified that he was a physician who specialized in psychiatry. At the time of the post-conviction hearing, Dr. Alexander had testified as an expert in psychiatry in approximately twenty criminal cases and twenty civil cases. In 2016, a couple of months before the Petitioner's second trial, lead counsel retained Dr. Alexander to help in preparation for trial. He explained that in this case, he was helping the defense establish that the Petitioner lacked the ability to form intent because of the Petitioner's intoxication level. Lead counsel was Dr. Alexander's primary contact on the defense team. Dr. Alexander spoke with lead counsel over the phone and in person regarding the Petitioner's case. An invoice of Dr. Alexander's services was entered as an exhibit.

To prepare for the Petitioner's trial, lead counsel informed Dr. Alexander about the number of drinks the Petitioner had consumed the day of the incident. Dr. Alexander said that he also interviewed the Petitioner and gathered information regarding his drinking that day. He testified that he had extensive conversations with the Petitioner regarding the incident, meeting with the Petitioner for three or four hours and speaking with the Petitioner on the phone one or two times. Dr. Alexander met with lead counsel and co-counsel, and he reviewed transcripts of the Petitioner's police interviews and video recordings of what occurred at the dorm. Dr. Alexander estimated that the Petitioner had consumed twenty-seven alcoholic drinks during an "all day drinking event." While viewing one of the video recordings, Dr. Alexander observed the Petitioner "driving, parking, attempting to get [the victim] in the car, banging her head, unintentionally, but in a way an intoxicated individual might do when trying to get her out of the car, and he searched for help because he couldn't manage her in her current state by himself." Dr. Alexander explained that he would be able to observe a person without knowing their blood alcohol level and "be able to tell fairly consistently" the person's level of intoxication.

Dr. Alexander testified that he had "a lot" of knowledge about intoxication and how it affects people and that he used a toxicology formula to determine an individual's blood alcohol level. Dr. Alexander said that the Petitioner's intoxication level was important but that he did not have to know the exact intoxication level to render his opinion about the

- 6 -

Petitioner's ability to form intent. Relying on the estimated number of alcoholic drinks the Petitioner had consumed, Dr. Alexander utilized the toxicology formula to determine the Petitioner's blood alcohol level. He input into the formula the approximated number of alcoholic drinks the Petitioner consumed, and the results indicated the Petitioner's blood alcohol level. Dr. Alexander explained that based on the formula results, the Petitioner had a high blood alcohol level, which would have caused the Petitioner to have had "poor impulse control," "poor judgment," and to be more susceptible to the influence of others. Based on his review of the evidence provided and the formula results, Dr. Alexander concluded that the Petitioner was "significantly impaired" on the day of the offenses. Dr. Alexander agreed that the Petitioner would have had "difficulty forming an intent to do any kind of particular thing[.]"

Dr. Alexander said that he testified at a pretrial hearing on June 13, 2016, to determine whether he would be able to testify at the Petitioner's trial. During the hearing, lead counsel asked him questions regarding the Petitioner's case. Dr. Alexander recalled that before the hearing, lead counsel informed him that his testimony would be limited to how to use the formula to obtain an approximate blood alcohol level. Dr. Alexander said that he understood his testimony would not be related to intoxication because he thought there was a toxicologist who would testify regarding intoxication. Had he been able to testify at trial, Dr. Alexander explained that he would have said, based on the Petitioner's blood alcohol level, the Petitioner would have had difficulty forming intent.

On cross-examination, Dr. Alexander testified that he had never been qualified as an expert in toxicology. When asked if he had previously testified that he did not interview the Petitioner, Dr. Alexander responded that he did not believe that was correct and stated, "I had interviewed [the Petitioner]. I interviewed him the day after [lead counsel] had initially contacted me," which was April 7, 2016. Dr. Alexander said that he "absolutely" interviewed the Petitioner in person for approximately three or four hours.

Dr. Alexander's previously admitted invoice for his work on the Petitioner's case indicated that Dr. Alexander did not interview the Petitioner until June 7, 2016, which was approximately one week before the Petitioner's second jury trial. Dr. Alexander said that his invoice was more accurate than his memory and that he did not interview the Petitioner immediately after speaking to lead counsel on April 7, 2016. The invoice also indicated that Dr. Alexander prepared his report that was dated May 27, 2016, before Dr. Alexander met with the Petitioner. The report contained Dr. Alexander's calculations regarding the number of drinks the Petitioner consumed and what his blood alcohol level would have been. Dr. Alexander said that his recollection was that he spoke with the Petitioner to obtain details of his hourly drinking and then made conclusions. However, he "concede[d]

that [his] invoice would be more accurate than [his] memory" and that his invoice indicated that his memory of interviewing the Petitioner before his report was incorrect. Dr. Alexander agreed that he made a calculation regarding the Petitioner's intoxication level before speaking with the Petitioner.

On redirect examination, Dr. Alexander said that he initially believed he was being retained as a psychiatric expert, as opposed to a toxicology expert. As such, he initially thought that his testimony would involve the Petitioner's behaviors he observed on the video recording and how those behaviors related to blood alcohol levels. Dr. Alexander said that it was lead counsel's decision on which questions to ask Dr. Alexander during the pretrial hearing and that if Dr. Alexander did not testify about certain topics, then it was because lead counsel did not ask him questions related to those topics.

The Petitioner testified that his trial defense team consisted of three attorneys and that lead counsel had the most contact with the Petitioner and his family. The Petitioner explained that he discussed defense strategy and the State's evidence with lead counsel. The Petitioner communicated with all three attorneys on his defense team, but lead counsel was his primary contact. The Petitioner explained that at times, he received contradictory guidance from lead counsel and other members of his defense team but that he generally followed lead counsel's advice. The Petitioner said that one member of his defense team wanted him to testify and wanted to call two witnesses to testify at trial, but lead counsel disagreed.

The Petitioner said that lead counsel told him that Dr. Alexander would testify at trial about how the Petitioner's alcohol intake affected his mental state. He explained that his primary trial defense strategy was that "[i]ntoxication impaired [his] judgment," which was also his defense at the first trial. The Petitioner said that after his case was severed from codefendant Batey, it became apparent that he would need an expert to testify to aid his defense. The Petitioner recalled that lead counsel had retained Dr. Alexander and that Dr. Alexander was going to testify about the Petitioner's impaired mental state. The Petitioner said that the State objected to a defense expert's testifying at trial because lead counsel had failed to comply with pretrial scheduling deadlines. The Petitioner recalled that during a teleconference call with his defense team, lead counsel said that he had committed malpractice by his failing to notify the State about the expert witness.

The Petitioner said that he eventually spoke with Dr. Alexander. Dr. Alexander interviewed the Petitioner in person, and they spoke for more than six hours. The Petitioner explained that Dr. Alexander reviewed surveillance footage of the Petitioner as well as photographs, including a photograph of the Petitioner's drinking from a one-half gallon

vodka bottle. The Petitioner explained that he consumed a "significant" amount of alcohol on the day of the incident. He explained that over the course of that day, his memory became increasingly vague and that he consumed "more alcohol that day than [he] ever had in [his] entire life." The Petitioner said that he eventually "black[ed] out." The Petitioner said that he could not remember exactly the number of drinks he consumed but that he was able to piece together an estimate through different sources. For example, the Petitioner explained that a photograph depicted the Petitioner's sitting in a car and his drinking from a one-half gallon bottle of vodka. He said that there were four other people in the car and everyone, except the driver, had shared approximately equal parts of the bottle of vodka.

The Petitioner said that lead counsel attempted to have a recorded voicemail message the Petitioner left for Mr. Quinzio, which included the Petitioner's "slurring" words and "incoherent" speech, admitted at trial. Lead counsel wanted to use the voicemail message as evidence of the Petitioner's "severe" intoxication, but the trial court ruled against its admission at trial.

The Petitioner testified that the trial court also excluded testimony regarding the Petitioner's codefendants: Mr. McKenzie, Mr. Banks, and Mr. Batey. The testimony related to an incident on the evening before the underlying events of this case and alleged that the codefendants had "group sexual contact" with another victim in the dormitory. The Petitioner explained that his defense team wanted to call the other victim and an investigator, who had investigated this incident, as trial witnesses. The Petitioner said that his defense team explained this testimony would be used to rebut the State's theory that the Petitioner was criminally responsible for his codefendants' conduct. However, the trial court restricted the testimony.

Regarding the Petitioner's indictment, the Petitioner said that lead counsel was responsible for challenging the indictment on a double jeopardy basis. The Petitioner said that he did not understand the argument but that lead counsel told him the indictment would be dismissed if the argument succeeded. The Petitioner said that if there were disagreements among the attorneys on his defense team, lead counsel made the final decisions.

On cross-examination, the Petitioner affirmed that "there was a multitude of evidence" of the Petitioner's intoxication presented at trial. Witnesses testified about seeing the Petitioner the night of the incident and observing his apparent intoxication level. The Petitioner recalled that videos depicting his intoxication levels were entered as exhibits at trial. The Petitioner also agreed that text messages he sent to Chris Boyd and

surveillance video recordings were entered as exhibits at trial. The Petitioner agreed that a surveillance video recording showed the Petitioner's placing a towel over the surveillance camera. The Petitioner said that he gave a statement to police based on information he had "piecemealed" together and that he did not have an "independent recollection" of the events from the night of the incident.

The Petitioner explained that during the six-hour interview with Dr. Alexander, they discussed the Petitioner's drinking on the day of the incident, a football-related concussion, and a car accident after which the Petitioner suffered "concussion-like symptoms." The Petitioner said that the car crash occurred a few weeks before the incident and that Dr. Alexander told the Petitioner "brain trauma" could create an enhanced effect of alcohol on a person's judgment. The Petitioner also told Dr. Alexander that before he attended college, he did not drink alcohol. The Petitioner said that he was not aware of any difficulties in scheduling a time to meet with Dr. Alexander and that he met with him when lead counsel arranged for him to do so. The Petitioner said that his understanding was that Dr. Alexander would testify about how differing levels of alcohol could affect a person's judgment.

Co-counsel testified that the Petitioner retained him and lead counsel after the Petitioner's first trial had been overturned. Co-counsel said that lead counsel made the final decisions in the case. Co-counsel explained that the expert witness used in the Petitioner's first trial was not available, so he and lead counsel discussed the need for a new expert. Lead counsel mentioned Dr. Alexander and told co-counsel he would take care of retaining him. Co-counsel said that he collected the trial evidence and gave it to Dr. Alexander.

On cross-examination, co-counsel testified that it was his understanding that Dr. Alexander was going to testify as a psychiatrist about the effects of intoxication on judgment. He explained that Dr. Alexander was not a forensic toxicologist. He said that lead counsel was responsible for meeting scheduling deadlines. Co-counsel said that he and lead counsel filed an interlocutory appeal after lead counsel failed to meet the scheduling deadline regarding Dr. Alexander's testimony. He explained that lead counsel's strategy was to have Dr. Alexander testify as a rebuttal witness to the State's proof at trial. Co-counsel said that this was why Dr. Alexander's testimony would have been limited. Co-counsel identified an email from lead counsel to co-counsel in which lead counsel said that if the trial court denied the Petitioner's motion to reconsider, then lead counsel could argue he had committed ineffective assistance of counsel by failing to have Dr. Alexander qualified as an expert. The email was admitted as an exhibit.

- 10 -

Co-counsel testified that the general trial strategy was that the Petitioner's intoxication level affected his ability to form his intent and that expert testimony regarding his intoxication was "very important." After failing to have Dr. Alexander's testimony admitted, the defense team relied on other evidence of intoxication in the record to obtain an intoxication jury instruction. Co-counsel said that expert testimony "certainly" would have "substantially aided" the defense.

Following the post-conviction hearing, the post-conviction court denied the Petitioner relief. In a written order, the post-conviction court found that the Petitioner's claim that he received the ineffective assistance of trial counsel by lead counsel's failure to give timely notice regarding his intent to call Dr. Alexander as an expert witness was without merit. The post-conviction court also found that the Petitioner did not receive the ineffective assistance of trial counsel by Dr. Alexander's not having the opportunity to testify regarding the effects of alcohol on the Petitioner's ability to form intent. The post-conviction court reasoned that Dr. Alexander was given the opportunity to express his opinions on the effects of alcohol at the pretrial hearing; however, Dr. Alexander did not do so. Moreover, the post-conviction court noted that the trial court excluded Dr. Alexander's testimony not because lead counsel failed to provide proper notice but because "(1) [Dr. Alexander] did not demonstrate any specialized expert opinion, knowledge or training regarding toxicology; and (2) he relied on information supplied via email by defense counsel and did not base any opinion on data, documentation, or scientific evidence." The post-conviction court also found that the underlying facts indicated a lack of trustworthiness of Dr. Alexander's testimony. The post-conviction court concluded that the Petitioner failed to demonstrate the outcome of the trial would have been different had Dr. Alexander testified about the effects of alcohol on the Petitioner's ability to form intent for the charged offenses. The post-conviction court also found that the Petitioner failed to show prejudice and denied relief regarding this issue.

The post-conviction court found that the Petitioner's allegation that lead counsel was ineffective by failing to successfully argue that prior bad act testimony regarding the Petitioner's codefendants should be admitted was meritless because it had been decided on direct appeal. The post-conviction court noted that the trial court and a panel of this court had previously determined that the prior bad act evidence was not relevant and that even if admitted, it would not have affected the outcome of the trial.

The post-conviction court determined that the Petitioner's allegation that lead counsel was ineffective by failing to have the Petitioner's voicemail to Mr. Quinzio admitted as an exhibit was without merit. The Petitioner argued that the voicemail would show that the Petitioner was "very intoxicated." The post-conviction court reasoned that

Mr. Quinzio testified at trial that the Petitioner sounded intoxicated and that Mr. Quinzio had never seen the Petitioner that intoxicated. The post-conviction court found that even if the voicemail had been admitted as an exhibit, the result of the trial would not have changed.

The post-conviction court ruled that the Petitioner's allegation that his protection against double jeopardy was violated when he was "re-tried on amended charges after jeopardy attached" was meritless. The post-conviction court found that the trial court and a panel of this court had already ruled on the issue and determined that the issue was meritless. Moreover, the post-conviction court found that the Petitioner had failed to show that trial counsel's performance was deficient or that the Petitioner was prejudiced by the alleged deficiencies.

The Petitioner filed a timely notice of appeal to this court from the post-conviction court's denial of relief. The case is now before us for our review.

## II.    ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Id.* Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.

### A.    Ineffective Assistance of Counsel

The Petitioner argues that the trial court erred by denying his claim for post-conviction relief because he received the ineffective assistance of trial counsel. The Petitioner argues that he received the ineffective assistance of trial counsel by (1) lead counsel's failure to have Dr. Alexander qualified as an expert psychiatrist at trial; (2) lead counsel's failure to introduce prior bad act evidence regarding the Petitioner's

- 12 -

codefendants at trial; and (3) lead counsel's failure to have the Petitioner's voicemail to Mr. Quinzio admitted as an exhibit at trial. The State responds that the post-conviction court did not err.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," and reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden v. State*, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

### 1.    Expert Testimony

The Petitioner argues that the post-conviction court erred by finding that Dr. Alexander had the opportunity to testify about the effects of intoxication on the Petitioner's ability to form intent. The Petitioner argues that lead counsel failed to elicit such testimony from Dr. Alexander during the pretrial hearing in order to have Dr. Alexander qualified as an expert psychiatrist.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007) (citing *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005)). Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

The Petitioner argues that lead counsel's performance was deficient. However, even if lead counsel's performance was deficient by his not asking appropriate questions, the Petitioner has failed to show how he was prejudiced. The record shows that Dr. Alexander had an opportunity to testify at the pretrial June 2016 hearing. The post-conviction court noted that the trial court determined that Dr. Alexander was not qualified as an expert, finding that Dr. Alexander would not have been qualified as an expert to testify about the effects of the Petitioner's intoxication level on his ability to form intent and finding that Dr. Alexander's testimony lacked trustworthiness. *See* Tenn. R. Evid. 703; s*ee also McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997) ("A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.")

We also note that Dr. Alexander was psychiatrist and not a toxicologist. *See Vandenburg*, 2019 WL 3720892, at *31. At the pretrial June hearing, Dr. Alexander testified that, after medical school, he had received no training in toxicology and that he did not normally prepare reports similar to the one he had prepared for the Petitioner. *Id.* at *30. Dr. Alexander said that he based his report on an email questionnaire containing the Petitioner's answers and that he did not interview the Petitioner. *Id.* At the post-

conviction hearing, Dr. Alexander testified that he was not certified in toxicology. Dr. Alexander said that he interviewed the Petitioner but admitted that the interview did not happen until after he had prepared his report. The Petitioner has failed to show that Dr. Alexander would have been qualified to testify about the effects of alcohol on the Petitioner's ability to form the requisite intent.

Dr. Alexander's testimony at both the pretrial hearing and the post-conviction hearing show that he was not a toxicologist and completed his report without first speaking to the Petitioner. In addition to not speaking with the Petitioner prior to writing his report, the proof from the pretrial hearing also demonstrates that Dr. Alexander did not review the surveillance footage of the Petitioner prior to such time. *Id*. at *31. Further, Dr. Alexander did not have enough information to determine whether the Petitioner was malingering. *Id*. In previously concluding that Dr. Alexander's proposed testimony lacked indicia of reliability, this court noted that "Dr. Alexander relied on self-serving and uncorroborated statements from [the Petitioner] to calculate [the Petitioner's] approximate BAC during the offenses." *Id*. at 33. With these considerations in view, the post-conviction court correctly found that Dr. Alexander's testimony was unreliable and would not have been admitted at the Petitioner's trial. This would be the case even if lead counsel had tendered Dr. Alexander in a different manner at the pretrial hearing, thus defeating a showing of prejudice under the *Strickland* standard.

Moreover, at the post-conviction hearing, Dr. Alexander testified that it would have been *difficult* for the Petitioner to form the requisite intent. *See State v. Hall*, 958 S.W.2d 679, 690 (Tenn. 1997) (holding a "lack of *capacity* to form the requisite culpable mental intent . . . is central to evaluating the admissibility of expert psychiatric testimony on [an] issue"). At the post-conviction hearing, Dr. Alexander did not testify that the Petitioner lacked the capacity to form the requisite intent. As such, Dr. Alexander's testimony, as proffered at the post-conviction hearing, would have been inadmissible at trial under the *Hall* standard. *See State v. Merritt*, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *27 (Tenn. Crim. App. Mar. 22, 2013) (holding that the trial court did not abuse its discretion in excluding evidence that the defendant's mental disease or defect impaired or reduced his ability to form the required mens rea, rather than stating that the defendant "completely lacked the capacity to commit premeditated first degree murder"); *State v. Austin*, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *6 (Tenn. Crim. App. Sept. 10, 2007) (holding that although the trial court erred in ruling that an expert witness could not testify about the ultimate issue of the defendant's mental state, the error was harmless because testimony that the defendant's mental disease merely "impacted" his capacity to form the required mental state was inadmissible under *Hall*); *State v. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207, at *4 (Tenn. Crim. App. Nov. 1, 2006)

("The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in *Hall* and [*State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005)].").

In any event, as conceded by the Petitioner at the post-conviction hearing, the trial record is replete with proof of the Petitioner's intoxication at the time of the offenses. As noted by co-counsel at the post-conviction hearing, lead counsel successfully obtained an intoxication jury instruction. This court previously noted on direct appeal that the proof of the Petitioner's guilt was "overwhelming." *Vandenburg*, 2019 WL 3720892, at *46. For the foregoing reasons, we conclude that the Petitioner was not prejudiced by any alleged deficiency of lead counsel related to the admission of Dr. Alexander's testimony.

### 2. Exclusion of Prior Bad Act Testimony

The Petitioner argues that he received the ineffective assistance of trial counsel by lead counsel's failure to litigate the Petitioner's motion to admit prior bad acts of his codefendants pursuant to Tennessee Code Annotated section 24-7-125. The Petitioner argues that counsel should have utilized this code section, rather than Tennessee Rules of Evidence 404(b) and 608, to show the codefendants' motive and intent in order to minimize the Petitioner's role. The Petitioner argues that because codefendants Batey, Banks, and McKenzie were not tried jointly with the Petitioner, they could not have been prejudiced by the probative value of this evidence. He argues that lead counsel should have raised this issue and argued that analysis of the probative value alone was the proper consideration. The State counters that this evidence was irrelevant and that the Petitioner is merely restyling an unsuccessful argument raised on direct appeal as an ineffective assistance claim.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible, and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. The court may, however, exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. Our supreme court has determined that Rule 404(b) applies only to the accused. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002).

- 16 -

In 2014, however, the General Assembly enacted Tennessee Code Annotated section 24-7-125, the language of which is "essentially identical" to Rule 404(b) except that it applies to "any individual, including a deceased victim, the defendant, a witness, or any other third party[.]" *See State v. Moon*, 644 S.W.3d 72, 82 (Tenn. 2022) (noting that section 24-7-125 "expanded Rule 404(b)'s protections to all witnesses in a criminal case").

Section 24-7-125 provides that in a criminal case, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The conditions that must be satisfied before the evidence is admitted are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. Code Ann. § 24-7-125.

Even if lead counsel was deficient by failing to argue for the admission of this evidence under Tennessee Code Annotated section 24-7-125, the Petitioner has failed to establish prejudice. Evidence that the Petitioner's codefendants did not need the Petitioner's encouragement or assistance to commit the offenses is not relevant to the Petitioner's criminal responsibility. *See* Tenn. Code Ann. § 39-11-402(2) (stating that a person is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense"). Importantly, as noted by the post-conviction court, a panel of this court found that the evidence was irrelevant. *Vandenburg*, 2019 WL 3720892, at *80; *see State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000) (holding that pursuant to the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same

- 17 -

as the facts in the first trial or appeal). Because the evidence was irrelevant, it would have been inadmissible whether counsel had argued under Rule 404(b) or Code section 24-7-125. The Petitioner has failed to show prejudice. Accordingly, he is not entitled to relief regarding this issue.

Also, regarding this bad act evidence, the Petitioner argues that the trial court violated his due process rights by limiting his right to present a defense and that lead counsel should have argued for admission under due process principles pursuant to both the Tennessee and United States Constitutions. However, this matter has already been decided on direct appeal from the Petitioner's convictions. *See Vandenburg*, 2019 WL 3720892, at *80 (determining that the Petitioner's "right to present a defense was not violated by the trial court's exclusion of the evidence" pertaining to the codefendants' prior bad acts). Post-conviction relief is not available for claims that have been previously determined. *See* Tenn. Code Ann. § 40-30-106(f). Furthermore, "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing[,]" and "[a] full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id*. at § 40-30-106(h). The Petitioner's "right to a defense" claim on this issue was previously determined on direct appeal. The Petitioner is not entitled to post-conviction review of this same issue.

### 3. Exclusion of Voicemail

The Petitioner argues that he received the ineffective assistance of trial counsel by lead counsel's failure to argue that his voicemail to Mr. Quinzio should have been admitted as a "disserving" rather than self-serving statement. The Petitioner also argues that lead counsel should have argued that the statements in the voicemail were non-hearsay, in that they were not offered for the truth of the matter asserted. The Petitioner asserts that had counsel made this argument, the evidence likely would have been admitted.

The Petitioner's claim must fail because lead counsel in fact advanced the same arguments at trial that the Petitioner now proposes on post-conviction. At trial, lead counsel argued that the voicemail was not self-serving in that it was "actually an admission that [the Petitioner] was present." *See Vandenburg*, 2019 WL 3720892, at *44. Lead counsel argued that the purpose of admitting the voicemail was to demonstrate that the Petitioner was "very intoxicated" and to form "a foundation for Mr. Quinzio's opinion that [the Petitioner] was drunk[,]" both non-hearsay justifications for the admission of the voicemail recording. *Id*. While lead counsel's arguments were unsuccessful in the trial court, this court later accepted the arguments advanced by lead counsel, holding that "the

- 18 -

trial court erred in excluding the voicemail as hearsay because the statements in the voicemail were not offered for the truth of the matter asserted." *Id*. at *46. The record shows that lead counsel did not act deficiently on this issue.

Even if lead counsel had performed deficiently, the Petitioner is unable to demonstrate prejudice. Despite ruling that the trial court erred in excluding the voicemail recording, this court held on direct appeal that, based on the "overwhelming evidence" of the Petitioner's guilt, "the exclusion of the voicemail was harmless error." *Id*. We agree with this assessment as it relates to the prejudice prong of *Strickland*. As noted, there was a plethora of evidence at trial indicating the Petitioner's high level of intoxication during the offenses. The admission of this voicemail recording would have done little to advance what was already an obvious fact. On the other hand, the admission of the Petitioner's statements in the voicemail would have likely prejudiced him in front of the jury. The voicemail places the Petitioner at the scene of the offenses when they occurred. Most damning, the voicemail contains the Petitioner's admission that one of his codefendants was "pissing on her p---y" and the Petitioner's acknowledgment that he was in "deep s---." *Id.* The Petitioner is not entitled to relief.

## B.  Superseding Indictment

The Petitioner argues that the trial court erred by denying his petition for post-conviction relief because the Petitioner's rights against double jeopardy under the Fifth Amendment to the United States Constitution and the Tennessee Constitution, article 1, section 10, were violated. The Petitioner argues that the trial court erred by permitting the Petitioner to be tried "on amended charges after jeopardy had attached." The Petitioner also argues that the trial court violated his constitutional rights by allowing the State to proceed with the superseding indictment without disposing of the original indictment, citing to *State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000) ("Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending."). The State responds that the Petitioner's double jeopardy challenges were previously determined by a panel of this court and the Petitioner's reliance on *Harris* is misplaced. Moreover, the State argues that the Petitioner waived review of his *Harris* issue by failing to raise it on direct appeal.

### 1.  Retrial on Amended Charges

The Petitioner argues that his rights against double jeopardy were violated because he was held to trial "on amended charges after jeopardy had attached." However, the Petitioner unsuccessfully raised this same issue on direct appeal. *See Vandenburg*, 2019

WL 3720892, at *21. This issue was previously determined, and the Petitioner is not entitled to post-conviction relief. *See* Tenn. Code Ann. § 40-30-106(f), (h).

### 2. *Harris* Issue

The Petitioner argues that because the State did not dismiss the original indictment against the Petitioner, the trial court violated his constitutional rights by allowing the State to proceed with the superseding indictment, effectively "having two indictments lodged against him simultaneously." The Petitioner argues that according to *Harris*, the State was required to elect which set of offenses they wanted to pursue at trial, which did not happen in the Petitioner's case. However, in *Harris*, our supreme court held that "the State may obtain a superseding indictment at any time prior to trial *without dismissing* the pending indictment and may then select the indictment under which to proceed at trial." 33 S.W.3d at 771 (emphasis added). Moreover, the Petitioner failed to raise this issue on direct appeal from his convictions. Accordingly, it is waived. *See* Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented"). The Petitioner is not entitled to relief regarding this issue.

### III. CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
KYLE A. HIXSON, JUDGE